**Roger H. NEELY, Plaintiff,**

v.

**W. Michael BLUMENTHAL, Secretary of the Treasury, and James A. Conlon, Individually and as Director of the Bureau of Engraving and Printing, and Etheridge Kent, Individually and as Chief, Office of Security, Bureau of Engraving and Printing, Defendants.**

**Civ. A. No. 76–1515.**

United States District Court, District of Columbia.

July 6, 1978.

Theodore Voorhees, Jr., Roderic V. O. Boggs, Washington, D. C., for plaintiff.

Lawrence T. Bennett, Asst. U. S. Atty., Washington, D. C., for defendants.

## OPINION

SIRICA, District Judge.

The question presented in this case, a federal employment discrimination suit raising related Title VII and constitutionally-based damage claims, is the scope of the exclusivity rule laid down in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). In particular, the question is whether *Brown,* in addition to *preempting* non-Title VII employment discrimination claims brought against federal employers in their official capacities, also *extinguishes* ancillary damage claims that are based on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) theories and are directed at federal officers in their individual capacities. Consideration of the precise rationale underlying *Brown* convinces the Court that Title VII does not bar related damage claims brought against individual officers. Yet a proper regard for the doctrine of implication underlying judicially-created *Bivens* actions leads the Court to conclude that no damage action need be implied where Title VII serves to vindicate the same rights sought to be protected by the damage claim.

## I. *Background Facts.*

The particulars of this controversy, as alleged,[1] are straightforward. A sketch of the material allegations contained in plaintiff's complaint reveals that beginning in 1968 plaintiff took a position as a security guard with the Bureau of Engraving and Printing (the Bureau), a unit of the Department of the Treasury. Plaintiff continued working for the Bureau as a GS–4 and later as a GS–5 level security officer until the agency removed him for cause effective July 20, 1971.[2] The stated reason for the

---

1. As is customary on motions to dismiss for failure to state cognizable claims, the well-pleaded allegations in plaintiff's complaint are accepted as true. Any embellishment of plaintiff's allegations is inadvertent and due to the fact this case has already reached the final stages of discovery and the factual record is well developed.

2. Just prior to his termination, plaintiff brought suit against his employer in an attempt to enjoin the agency from removing him. The gist of this application was that the Bureau failed to conform to due process standards by denying plaintiff a formal pre-termination hearing. The District Court denied plaintiff preliminary relief and, on appeal, the denial of plaintiff's applica-

disciplinary action was repeated acts of misconduct in the course of plaintiff's employment.

Plaintiff in his complaint, however, paints a far different picture of his job performance and the reasons why the agency removed him. Commencing in early 1969, plaintiff alleges, he became aware that the Bureau was failing to provide agency employees with equal employment opportunities irrespective of their race. Plaintiff perceived that blacks held an inordinately small number of the higher grade jobs within the various departments of the Bureau. This was so even though the great majority of Bureau workers were black.

Along the same lines, plaintiff became aware that just as blacks held a disproportionately small number of the upper level posts, black employees enjoyed disproportionately fewer of the employment-related benefits and privileges that accompanied higher grade employment at the agency. In addition, plaintiff perceived that the structure and operation of the Bureau's Equal Employment Opportunity (EEO) program did not fairly advance the interests of black workers because interested members of the agency's Employees' Committees lacked a meaningful voice in EEO affairs.

Moved by these concerns, plaintiff avers, he assumed the role of an advocate in order to instigate changes in the Bureau's operations aimed at improving the opportunities available to fellow employees in the lower grades who, it is claimed, were predominantly black. Plaintiff's methods were blunt and to the point. Regarding the preferential assignment of parking privileges, plaintiff confronted the management of the agency with proposals to reform the existing policy for distributing parking spaces. When these efforts proved to be unavailing, plaintiff decided to test the policy directly by breaching parking rules with an apparent view towards finding out if the rules were valid. The agency responded by reprimanding plaintiff for violation of applicable parking regulations. Plaintiff claims that this response constituted a reprisal against him.

Similarly, regarding inadequacies in the operation of the EEO program, plaintiff confronted Bureau authorities with suggestions designed to spur changes in prevailing EEO policy. On one occasion, plaintiff spoke up at an EEO meeting to express his ideas on the issue but was met with opposition by some of the EEO officers in attendance. This opposition led to what was apparently a rancorous exchange among plaintiff and the Bureau officials because the agency later cited him for misconduct as a result of his behavior. Plaintiff claims that this reprimand was unwarranted.

At another EEO meeting, plaintiff attempted to convince an attending officer of perceived deficiencies in the EEO program. The circumstances behind this discussion, too, were apparently of a character that the agency found objectionable because the Bureau subsequently relied on the exchange as one of the grounds for plaintiff's termination. Plaintiff claims that his conduct was at all times undertaken in good faith.

On numerous other occasions, plaintiff came into conflict with his superiors over unspecified matters. Plaintiff conceived these disputes to be harassment and discrimination. He did not, however, attempt to redress his grievances by petitioning the wrongdoers as agency policy required. Instead, he took his concerns directly to his supervisors' superior who, over plaintiff's objections, decided to air the matter by holding a meeting with all concerned parties in attendance. Plaintiff then refused to participate on that basis because he felt he could not express his grievances to Bureau officials in the presence of his immediate supervisors. The agency later advanced this refusal in support of plaintiff's termination.

tion was affirmed. *Neely v. Simon*, 162 U.S. App.D.C. 19, 495 F.2d 1075, (1974). During the pendency of plaintiff's appeal, proceedings on plaintiff's administrative challenge to his removal were stayed. After the Court of Appeals' decision, these proceedings moved forward, resulting in a final decision adverse to plaintiff. This lawsuit followed.

By letter dated April 30, 1971, the Bureau furnished plaintiff with a notice of proposed termination. This notice informed plaintiff that the basis for his removal was repeated acts of misconduct arising out of, among other incidents, the parking infractions, the EEO meetings and grievance procedure. On July 19, 1971, the Bureau issued a decision sustaining each specification of misconduct and discharging plaintiff effective the following date.

Plaintiff contested his termination as racially tainted. After unsuccessfully pursuing available avenues of relief within the agency and Civil Service Commission, plaintiff brought his challenge to court. Count I of plaintiff's complaint alleges violations of rights of advocacy guaranteed by Title VII of the Amended Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (Supp. V 1975). In particular, plaintiff claims that the disciplinary action taken against him is racially tainted in violation of Title VII because it stems from his active and vocal opposition to employment practices at the Bureau that disproportionately affected black workers. Plaintiff names the head of his Department as the defendant with respect to Count I and for relief seeks various injunctive remedies including reinstatement, back pay and an order restraining agency authorities from depriving plaintiff of his right to discuss and advocate changes in EEO policy at the Bureau.

Count II of plaintiff's complaint similarly alleges infringement of rights of advocacy secured to plaintiff. Like Count I, Count II challenges the disciplinary action taken against plaintiff as unlawfully punishing protected conduct on behalf of fellow minority employees. But unlike plaintiff's first count, which is based on a statutory anti-discrimination provision that has been construed to protect advocacy in the employment context, plaintiff's second charge is founded on the more primary protections of free speech afforded by the first amendment to the Constitution. And unlike Count I, Count II names in their individual capacities [3] two agency officers who played a part in plaintiff's removal and seeks to recover money damages from them based on a *Bivens* theory.

Defendants have moved for an order dismissing plaintiff's constitutionally-based damage claim. Defendants' principal line of attack is the exclusivity rule established in *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). *Brown* held that the remedies for discrimination in federal employment provided in Title VII are the exclusive means of redress against the federal government. Consequently, the plaintiff in that case was barred from proceeding against the federal government on *any* anti-discrimination theory because he had not complied with the procedural requirements of Title VII.

Defendants read *Brown* expansively. Implicit in their motion is the contention that *Brown* not only preempts non-Title VII avenues of relief against the federal government (official remedies), but also forecloses remedies available against individual officers (individual remedies) of the kind sought by plaintiff here in Count II of his complaint. Defendants' position seems to be that if an employment practice is susceptible to being challenged as discriminatory under Title VII, it can only be challenged under Title VII and on no other basis regardless of the theory underlying the alternative claim and irrespective of the kinds of remedies being sought. An appraisal of the merits of this argument requires a close reading of the *Brown* decision with special attention to the rationale developed by the Court to shape its exclusivity rule.

---

**3.** These defendants, James A. Conlon and Etheridge Kent, are also named in their official capacity insofar as plaintiff seeks injunctive relief directed at them. Conlon is the Director of the Bureau and as such has overall responsibility for the agency's operations, including decisions to terminate employees. Kent is Chief of the Bureau's Office of Security where plaintiff worked until he was discharged. The role played by Kent in plaintiff's removal was that he prepared the specifications of misconduct that provided the basis for plaintiff's being fired.

II. *Brown does not Foreclose Bivens Claims.*

■ The judicial remedies available to federal employees under Title VII to redress employment discrimination are encompassing. Section 706(g) of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 259, 42 U.S.C. § 2000e–5(g) (1970), as made applicable to federal employees by section 11 of the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 111, 42 U.S.C. § 2000e–16(d) (Supp. V 1975), affords federal sector employees a full complement of remedial orders against offending agency employers, including general preventive and affirmative injunctive relief, reinstatement, back pay, retroactive promotion and the catch-all remedy of "any other equitable relief as the court deems appropriate." There is, however, one important exception to this broad remedial scheme. Section 706(g) of Title VII does not allow aggrieved employees to recover damages as redress for proscribed conduct.[4]

■ In the private sector, the omission of a damage remedy from Title VII is of no great consequence. This is because in the context of private employment Title VII poses no obstacle to suits based on other anti-discrimination provisions. As stated by the Supreme Court in *Johnson v. Railway Express Agency,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), "Despite Title VII's range and design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses in his search for relief." *Id.* at 459, 95 S.Ct. at 1719. And as

also stated by the Supreme Court, Congress made clear "that the remedies available to the individual under Title VII are co-extensive with the indiv[i]dual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive." *Id.* Section 1981 generally permits workers aggrieved by discrimination[5] to recover compensatory and, in certain circumstances, exemplary damages.[6]

■ But the same rule does not hold true for federal employees. In contrast to their counterparts in other sectors, individuals employed by federal agencies enjoy only the injunctive remedies afforded by Title VII to bring to bear against the federal government. The controlling precedent is the *Brown* decision. In *Brown,* the extension of Title VII remedies to federal employees brought about by the Equal Employment Opportunity Act of 1972 was held to preempt all other statutory bases for seeking relief against the federal establishment. *Id.* at 835, 96 S.Ct. 1961. These preempted alternatives ostensibly include claims against the government based on the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1970), the Mandamus Act, 28 U.S.C. § 1361 (1970), the Tucker Act, 28 U.S.C. § 1346 (1970) and the Administrative Procedure Act, 5 U.S.C. § 702 (1970). *Id.* at 824–25, 828 n.10, 96 S.Ct. 1961.

■ Under *Brown,* then, either the aggrieved employee complies with the procedural requirements necessary to invoke Title VII, or he is without any avenue of

**4.** *See, e. g., Loo v. Gerarge,* 374 F.Supp. 1338, 1341–42 (D.Haw.1974); *Howard v. Lockheed-Georgia Co.,* 372 F.Supp. 854, 855–56 (N.D.Ga. 1974). These cases were noted by the Supreme Court in *Johnson v. Railway Express Agency,* 421 U.S. 454, 458 n.5, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).

**5.** This is so at least where racial discrimination is at issue. There is, however, a growing body of law to the effect that 1981 proscribes discrimination on grounds other than race.

**6.** *See, e. g., Caperci v. Huntoon,* 397 F.2d 799 (1st Cir.), *cert. denied,* 393 U.S. 940, 89 S.Ct.

299, 21 L.Ed.2d 276 (1968); *Mansell v. Saunders,* 372 F.2d 573 (5th Cir. 1967).

42 U.S.C. § 1981 (1970) provides:
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

relief against the federal government to redress his claim of discrimination. And just as importantly under *Brown,* even if the preconditions to Title VII are met, the employee is limited in the relief he can obtain to the equitable remedies provided in section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g) (Supp. V 1975).

This disparity in remedies available to federal and private sector employees has not gone unchallenged, however. The absence of a damage remedy against the federal government has led aggrieved federal workers to pursue damage actions directly against the discriminating officials in their individual capacities. Numerous theories have been invoked to support this method of proceeding. One derives from 42 U.S.C. § 1985 (1970),[7] a statutory provision that creates civil liabilities for participating in conspiracies to prevent federal officers from performing their duties and for conspiring to deny persons the equal protection of the law or equal privileges or immunities under the law. *Id.* § 1985(1) & (3) (1970). *See, e. g., Stith v. Barnwell,* 447 F.Supp. 970 (M.D.N.C.1978); *Brosnahan v. Eckerd,* 435 F.Supp. 26 (D.D.C.1977). Another basis relied on to bring suit for money damages directly against discriminating officials is the common law right of action for intentional infliction of emotional distress. *See,*

*e. g., Dual v. Roudebush,* No. 76–0005 (D.D.C., filed Nov. 12, 1976) (unpublished opinion).[8] A final theory is a cause of action for money damages implied directly from constitutional provisions that afford protection against discriminatory conduct. *See, e. g., Carter v. Marshall,* No. 76–365 (D.D.C., filed Feb. 3, 1978) (raising claims for damages based on first and fifth amendments).

None of these theories, however, has fared well with the courts. In *Stith,* plaintiff's section 1985 claim of a conspiracy to remove him from his government job because of his attempts to increase minority participation and equal racial treatment in agency programs was held to be actionable under Title VII and, under *Brown,* only on the basis of Title VII. *Stith v. Barnwell, supra,* 447 F.Supp. at 974. *Dual* likewise held that the preemptive sweep of *Brown's* exclusivity rule was broad enough to bar a federal employee's "common law remedies for torts arising in the context of alleged employment discrimination." Slip op. at 2. Finally, in *Carter,* plaintiff's "claims under the first and fifth amendments" based on "alleged acts of retaliation by defendant [officer] in response to her assertions of discrimination" were found to be redressable "under Title VII and therefore [these] claims will be dismissed." Slip op. at 6–7.[9]

---

**7.** 42 U.S.C. § 1985 (1970) provides in relevant part:

(1) If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from . . . holding any office, . . . under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed . . . ;

. . . . . . . .

(3) If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right

or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**8.** *See also Dual v. Roudebush,* No. 76–0005 (D.D.C., filed Feb. 9, 1977) (unpublished opinion) (denying plaintiff leave to file amended complaint adding more explicit claims of intentional infliction of emotional distress).

**9.** In dismissing plaintiff's constitutionally-based claims, *Carter* distinguished *Harney v. Secretary of HEW,* No. 76–812–A (E.D.Va., filed Aug. 13, 1977). That case presented first and fifth amendment claims that were not covered by Title VII, so they could not be preempted by *Brown's* preclusion rule. *See also Marynowych v. Boorstin,* No. 76–1480 (D.D.C., filed Feb. 8, 1977) (suggesting validity of first amendment claim for damages to vindicate interests not protected by Title VII).

As the court stressed: "Title VII provides full and adequate relief for such conduct and that remedy is exclusive." *Id.* at 6.

The results reached in *Stith, Dual* and *Carter* are understandable and make eminently good sense. There is little reason to stretch marginally applicable statutory, common law and constitutional theories of individual recovery to cover discrimination in federal employment when Title VII furnishes an explicit method of redress against the federal government. This is especially so when consideration is given to the fact that the broad array of injunctive remedies provided in Title VII is in all but exceptional cases adequate to make aggrieved parties whole. Also worthy of attention in this regard is the fact that in federal sector employment Title VII prefaces resort to the courts with specific administrative procedures that could be deliberately bypassed if suits for damages against individual officers were sanctioned based on grounds independent of Title VII.[10]

But no matter how sensible the results in *Stith, Dual* and *Carter* are regarding the exclusivity of Title VII remedies, these decisions are not controlled by the holding in *Brown.* The reason is that *Brown* did not address the question of Title VII's preemptive effect on discrimination suits brought against individual officers for damages. This point is confirmed by a review of both the facts and the reasoning developed in the *Brown* case. A review of the facts in *Brown* reveals that plaintiff, in contrast to the complainants in *Stith, Dual, Carter* and the case at bar, did not attempt to redress his claim of discrimination through a damage action directed at the discriminating officials in their individual capacities. Instead, he directed his complaint at his agency and employing officers in their official capacities, seeking official remedies consisting of "a promotion to Communications Assistant, GS–9, a supervisory position, and appropriate back pay."[11] *Brown* therefore does not settle the point that Title VII preempts individual damage actions because the issue was never presented.[12]

The confines of *Brown's* exclusivity holding are also delineated by the analysis developed in *Brown. Brown* was decided on the basis of the sovereign immunity doctrine, a doctrine that curtails the ability of claimants to obtain official relief *against the federal government,* including relief taking the form of retroactive promotion and back pay. As the Eighth Circuit stated

10. In addition, it should be noted that if Title VII claimants were permitted to join Title VII and constitutional tort claims in a single action, a number of problems would inevitably arise in connection with the processing of discrimination suits. First, Title VII suits are non-jury matters, while jury demands are proper in *Bivens* actions. Thus, to the extent that a complainant's statutory and constitutional claims arise out of the same transactions, permitting joinder of the two kinds of actions would pose the prospect of converting every Title VII suit into a jury action. This Court's experience with Title VII cases makes clear that Title VII actions are peculiarly well-suited for disposition by the Court because litigants, in the interest of expediting their cases, frequently will allow the Court to consider as evidence all or part of the earlier developed administrative record. This practice is unlikely if Title VII cases were made jury matters by the addition of constitutional claims.

Moreover, Title VII requires that statutorily-based suits be expedited and tried within 120 days, 42 U.S.C. § 2000e–5(f)(5) (Supp. V 1975), while no such requirement applies to constitutional tort actions. Given this, the result might well be that compliance with section 2000e–5(f)(5) will require the Court to bifurcate the proceedings into two trials with an apparent waste of judicial resources.

11. *Brown v. General Services Administration,* 507 F.2d 1300, 1303 (2d Cir. 1974). The Court of Appeals did point out, however, that while plaintiff sought official injunctive remedies to redress his claim, "some reference is made *in his brief* to damages based on discrimination." *Id.* at 1303 (emphasis supplied). Judging from the Second Circuit's sovereign immunity rationale, it can be safely assumed that plaintiff, if in fact he was seeking to recover damages, directed his damage claims against the federal government, and not his supervising officers.

12. It should be pointed out that plaintiff did attempt to base his claim on the Tucker Act, 28 U.S.C. § 1346 (1970). But damages recoverable under the Tucker Act are recoverable against the United States, and not against individual officers. As it turned out, the District Court denied plaintiff leave to add a claim based on the Tucker Act. *Brown, supra,* 507 F.2d at 1303.

in *Gnotta v. United States*, 415 F.2d 1271, 1277 (8th Cir. 1969) (Blackmun, J.), *cert. denied*, 397 U.S. 934, 90 S.Ct. 941, 25 L.Ed.2d 115 (1970):

> A suit against an officer of the United States is one against the United States itself 'if the decree would operate against' the sovereign, *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963); or if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration', *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act', *Larson v. Domestic & Foreign Commerce Corporation*, 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949).

Citing *Gnotta*, the Second Circuit in *Brown* found that plaintiff's "demands for promotion and back pay fall within the scope of this immunity as they necessarily involve expenditures from the Treasury and compel the exercise of administrative discretion in an official personnel area." *Brown v. General Services Administration*, 507 F.2d 1300, 1307 (2d Cir. 1974). But the Court of Appeals also found that Title VII constituted a waiver of sovereign immunity with respect to claims of employment discrimination seeking governmental relief in the form of back pay and retroactive promotion. *Id.* Nevertheless, recognizing that "statutes waiving sovereign immunity are to be strictly construed" and that "Congress can impose restrictions on its

consent to be sued [citation omitted], including limitations on the time within which suit must be commenced [citation omitted]," *id.*,[13] the Second Circuit affirmed the dismissal of all of plaintiff's claims against the government on the grounds that "it would wholly frustrate Congressional intent to hold that a plaintiff could evade the 30 day filing requirement 'by the simple expedient of putting a different label on [his] pleadings.'" *Id., quoting, Presier v. Rodriguez*, 411 U.S. 475, 489–90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973).[14]

On appeal, the Supreme Court similarly analyzed the question of preemption in terms of the sovereign immunity doctrine. Looking to the relevant legislative history to discern legislative intent, the Court found that the Congress that passed the 1972 Amendments to Title VII was acting with the understanding that the Amendments "would '[f]or the first time, permit the Federal employees to sue *the Federal Government* in discrimination cases.'" *Brown, supra*, 425 U.S. at 828, 96 S.Ct. at 1965, *quoting*, 118 Cong.Rec. 4929 (1972) (remarks of Sen. Cranston) (emphasis supplied). Until then, effective remedies for discrimination in the federal sector were generally thought to be "barred by sovereign immunity." *Id.* at 826 & 827 n.8, 96 S.Ct. at 1965. And reasoning that a Congress which "was persuaded that federal employees who were treated discriminatorily had no effective judicial remedy" must have intended its remedial legislation to be the government's sole consent to suit, *id.* at 828, 96 S.Ct. at 1966, the Court concluded

---

**13.** *See also United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), where the Supreme Court recently emphasized:

> the United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' . . . And it has been said . . . that a waiver of traditional sovereign immunity 'cannot be implied but must be unequivocally expressed.' [citations omitted].

**14.** Since the plaintiff in *Brown* had attempted to reverse the dismissal of his several discrimination claims on the grounds that, apart from

Title VII, he stated claims against the government based on the Mandamus Act, 28 U.S.C. § 1361 (1970), the Administrative Procedure Act, 5 U.S.C. §§ 701–06 (1970), the Tucker Act, 28 U.S.C. § 1346(a) & (b) (1970) and the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1970), the necessary effect of the Second Circuit's conclusion is that the more specific waiver of sovereign immunity contained in Title VII takes precedence over other general waivers. This notion was restated approvingly when, on appeal, the Supreme Court in *Brown* said: "a narrowly tailored employee compensation scheme preempts the more general tort recovery statutes." *Brown, supra*, 425 U.S. at 835, 96 S.Ct. at 1969.

## 954

that "this unambiguous congressional perception seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 829, 96 S.Ct. at 1966.

■ The import of the sovereign immunity element in the *Brown* rationale is not difficult to understand. Sovereign immunity serves to protect the federal government from unconsented suits that go to invading the public treasury and mandating governmental action. *See Gnotta, supra,* 415 F.2d at 1277. But the doctrine does not extend to protect government officers from personal liabilities arising out of their official activities. Sovereign immunity and the various officer immunities offer separate protections that protect separate interests. Research discloses no case that has held that the two kinds of immunities are integrated in such a way that, if the government consents to suit, parallel remedies against individual officers for the same conduct are of necessity extinguished.

■ Indeed, just the opposite appears to be the law. The Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (1970), for example, waives sovereign immunity to make the federal government liable for tortious injuries caused by federal employees in generally "the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674. The Act makes clear that the waiver of immunity "provided by this title in such cases shall be exclusive." *Id.* § 2679(a).[15] But this exclusivity principle does not mean that tort actions covered by the Act and brought against government employees in their personal capacities are cut off simply because the government itself has consented to be liable. If it did, there would have been no reason for inserting into the Act a second exclusivity provision that states that, for a certain class of tort injuries, injuries resulting from motor vehicle accidents, "the remedy against the United States provided" by the Act "shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim." *Id.* § 2679(b).[16]

■ Taking the Federal Tort Claims Act as a model, it emerges that waivers of sovereign immunity do not in and of themselves affect preexisting remedies available against individual officials. This is so even though the waivers embody exclusivity principles. Only when the waivers reflect an explicit intent to extinguish parallel remedies is the potential for individual liability diminished. Since nothing in Title VII reveals an intent to disturb avenues of

---

**15.** 28 U.S.C. § 2679(a) (1970) provides:

The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

**16.** 28 U.S.C. § 2679(b) (1970) reads:

The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property or personal injury or death, resulting from the operation by any employee of the Government of any motor vehicle while acting within the scope of his employment, shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against the employee or his estate whose act or omission gave rise to the claim.

That a special statute is needed to immunize federal officers from suit was recently recognized by three Justices of the Supreme Court in *Martinez v. Shrock,* 430 U.S. 920, 97 S.Ct. 1339, 51 L.Ed.2d 600 (1977) (dissenting views against denial of *certiorari*). *Martinez* involved a wrongful death suit against military doctors by representatives of a retired military officer who died as a result of malpractice. Noting that, *subsequent to* the filing of plaintiffs' complaint, Congress enacted a special statute designed to immunize federal medical personnel from malpractice claims, *see* 10 U.S.C.A. § 1089 (1978 Supp.), Justice White wrote:

In the past, when Congress has seen fit to immunize certain categories of federal officials, including physicians, *it has done so by statute.* See 38 U.S.C. § 4116 (1970 ed. and Supp. V); 42 U.S.C. § 233. . . . *Apart from these statutes,* this Court has recognized a very narrow category of judicially created absolute immunity for some federal officials. (emphasis supplied).

relief against discriminating officials in their personal capacities, *Brown's* preemption rule stands circumscribed to the extent of cutting off only official remedies for federal employment discrimination.[17]

### III. *No Bivens Action Need be Implied.*

This conclusion regarding the limits of *Brown* does not, however, settle the question of plaintiff's ability to proceed against his alleged discriminators. Plaintiff bases his complaint on a *Bivens* theory that a cause of action for money damages to redress discriminatory treatment arises directly under the Constitution. Contrary to plaintiff's suggestion, this assertion is far from a foregone conclusion. Indeed, as will appear more fully below, the implication of a damage remedy to redress conduct actionable under Title VII and to indicate interests already protected by the amended Civil Rights Act is doubtful as a matter of policy and unsupported by the case law.

### (1)

Analysis begins with an inquiry into the doctrine of implication depicted in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the seminal decision dealing with damage actions implied directly from the Constitution. *Bivens* involved a suit in which plaintiff alleged that federal officers breached rights of privacy secured to him under the fourth amendment by forcibly intruding into his residence, searching the premises without a warrant and probable cause, using unreasonable force to effect his arrest and subjecting him to the humiliation of a visual strip search. Plaintiff brought suit against the individual officers to recover money damages for mental suffering and humiliation.

Defendant officers sought to sustain the dismissal of plaintiff's complaint on the grounds that, where Congress has not expressly authorized a remedy to redress privacy violations by federal officers, individuals in plaintiff's position should be limited "to redress[ing] invasion of these rights only by an action in tort, under state law, in the state courts." *Bivens, supra*, 403 U.S. at 390, 91 S.Ct. at 2002. Defendants maintained that this limitation was not unduly harsh because "if the [federal] agents were shown to have violated the Fourth Amendment," then they would lose their tort defense of acting with lawful federal authority and "would stand before the state law merely as private individuals." *Id.* at 391, 91 S.Ct. at 2002. State trespass laws generally "prohibit or penalize [privacy violations] if engaged in by a private citizen." *Id.* at 392, 91 S.Ct. at 2002.

*Bivens* rejected this line of argument for three principal reasons. The first and foremost of these was that the range of conduct outlawed by the fourth amendment differed materially from the kinds of activities forbidden under the various state trespass laws. As the Court stressed: "Our cases have long since rejected the notion that the Fourth Amendment proscribes only such conduct as would, if engaged in by private persons, be condemned by state law." *Id.* at 392, 91 S.Ct. at 2002. Consequently, if persons like plaintiff were remitted to state forums to redress the abridgment of their privacy rights, situations would inevitably arise where conduct unlawful under federal

---

**17.** Nothing in *Richardson v. Wiley*, 186 U.S. App.D.C. 309, 569 F.2d 140 (1977) requires a different conclusion. In *Richardson*, the Court of Appeals found that plaintiff had failed to comply with the filing requirements of Title VII and thus, under *Brown*, could not seek back pay and retroactive promotion remedies based on fifth amendment and 42 U.S.C. § 1981 (1970) claims. The application of *Richardson's* reading of the *Brown* decision does not, however, mean that the plaintiff in the instant case is barred from seeking a damage remedy from individual officers. Unlike in this case, the remedies sought in *Richardson* were all official injunctive remedies. So, in holding that plaintiff was barred from obtaining injunctive relief on any of his non-Title VII theories, the Court of Appeals did not decide the question of *Brown's* preemptive effect on constitutional damage causes of action. The only application *Richardson* can have in the case at bar is with regard to plaintiff's first amendment claim for injunctive relief also available under Title VII. Accordingly, based on the *Richardson* decision, the Court will dismiss plaintiff's constitutional claim for injunctive remedies.

standards would be condoned on state law principles.

In a like vein, a second reason for rejecting defendants' position stemmed from the fact that the fourth amendment safeguards interests that differ from what state laws protect. "The interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile." *Id.* at 394, 91 S.Ct. at 2003. So, to the extent that hostile state laws could undermine federally protected rights by "authoriz[ing] federal agents to violate the Fourth Amendment," an independent cause of action based on federal privacy law becomes necessary. *Id.* at 395, 91 S.Ct. at 2004.

A final reason for overcoming defendants' objections to the implication of damage actions for fourth amendment violations was the appropriateness and necessity of allowing the traditional remedy of damages as compensation for personal injuries occasioned by "an invasion of personal interests." *Id.* Citing *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), a case that implied a damage action for securities violations based on appropriateness and necessity considerations, the *Bivens* majority found nothing inappropriate in permitting persons aggrieved by fourth amendment violations to redress their "injur[ies] through a particular remedial mechanism normally available in the federal courts." *Id.* 403 U.S. at 397, 91 S.Ct. at 2005. This was so despite Congressional inaction because "the present case involves no special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* at 396, 91 S.Ct. at 2004. *See also id.* at 403–409, 91 S.Ct. 1999 (Harlan, J., concurring).

The necessity for granting plaintiff a damage remedy was also apparent. As Justice Harlan made clear in his concurring opinion:

> it is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged position. It will be a

rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive relief from any court. However desirable a direct remedy against the Government might be as a substitute for individual official liability, the sovereign still remains immune to suit. Finally, assuming Bivens' innocence of the crime charged, the 'exclusionary rule' is simply irrelevant. For people in Bivens' shoes, it is damages or nothing.

### (2)

■ None of the considerations that guided the result in *Bivens* are present in the instant case, however. Unlike in *Bivens*, the plaintiff in this case will not be relegated to pursuing claims based on hostile state law theories if no constitutional damage action is implied allowing him to redress the alleged invasion of his rights of advocacy. Plaintiff's right to speak out against discriminatory practices carried on by his employers is fully vindicated by Title VII. The language of the Act expressly prohibits employers from taking adverse action against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e–3(a) (Supp. V 1975). And numerous cases have held that disciplining an employee who challenges discriminatory conditions of employment gives rise to a cognizable Title VII claim. *E. g., Stith, supra* at 974. *See also Sperling v. United States*, 515 F.2d 654 (3rd Cir. 1975); *Pettaway v. American Cast Iron Pipe Co.*, 411 F.2d 998 (5th Cir. 1969).

Similarly, contrary to the situation faced by plaintiff in *Bivens*, the plaintiff in this case does not run the risk of being unable to safeguard constitutionally protected interests in free expression if no damage action is implied in his favor. To the extent that Title VII protects employees against reprisals based on their advocacy in support of minority rights, the statute serves as a more than adequate vehicle for vindicating first amendment interests. *Compare Mahone v. Waddle*, 564 F.2d 1018, 1022–25 (3d

Cir. 1977) (declining to imply a constitutionally based cause of action but finding an effective federal statutory remedy in section 1981). Indeed, inasmuch as *Bivens* suits are apt to encounter the obstacle posed by the doctrine of official immunity, employees penalized for their opposition to discriminatory employment practices are likely to find that proceeding under Title VII affords greater protection of free expression than does proceeding under constitutional theories.

Nor is there any apparent necessity for implying a damage remedy in plaintiff's favor in the present case. By contrast to *Bivens*, where plaintiff was confronted with the prospect of recovering "damages or nothing," 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring), the plaintiff here has the benefit of the full range of remedies provided in Title VII. Moreover, these remedies are particularly well suited to making plaintiff whole because, unlike the plaintiff in *Bivens*, the plaintiff in the case at bar has claimed economic rather than mental injuries that are fully redressable by the injunctive, reinstatement and back pay remedies authorized by Title VII.

The relief afforded by Title VII, including the monetary back pay component, is of course directed at the government and not the alleged individual discriminators. But plaintiff has no right to insist that his recovery come out of the pocketbooks of his superiors rather than out of governmental funds. While the imposition of individual liability can be justified on "the deterrent effect liability will have on federal official conduct," *id.* at 408, 91 S.Ct. at 2010 (Harlan, J., concurring), the prospect of having to answer in damages is not the only influence that effects deterrence. Federal officers are periodically evaluated on their EEO performance in ways that hinge their advancement in federal service on this aspect of their personnel record.[18] Just as importantly, federal officials are subject to weighty administrative sanctions if they are found to have engaged in discriminatory conduct.[19] Wholly aside from potential damage liability, then, respect for the rights of fellow employees is already something that can reasonably be expected.

In short, a comparison of *Bivens* and the instant case reveals no reason in fact or logic for implying a constitutionally-based damage remedy against the individual officers named as defendants in plaintiff's complaint. *Bivens*, however, is only the starting point for analysis. "Numerous jurisdictions have apparently concluded that Bivens establishe[s] a cause of action for damages arising from the violation of any constitutional right by a federal official." *Briggs v. Goodwin*, 186 U.S.App.D.C. 179, 186, 569 F.2d 10, 17 n.8 (1977).[20] Thus the question arises whether this expanded view of the leading case is also the law in this Circuit.

### (3)

Since *Bivens*, the Supreme Court has neither extended nor amplified on its original

---

**18.** *See* Evaluation and Rating Form for Supervisors Performance in EEO, NAVSO 12430/7 (12–74).

**19.** 5 C.F.R. § 713.221(c) (1977) provides:

When discrimination is found, the agency shall require remedial action to be taken in accordance with section 713.271, shall review the matter giving rise to the complaint to determine whether disciplinary action against alleged discriminatory officials is appropriate, and shall record the basis for its decision to take or not to take, disciplinary action . . ..

So substantial are the adverse effects occasioned by a finding of discrimination that one alleged discriminator has filed suit in this Court to challenge the constitutionality of the procedures leading to the imposition of administrative sanctions. *See Graham v. Claytor*, No.

77–995 (D.D.C., crossmotions for summary judgment taken under advisement March 3, 1978).

**20.** In *Briggs*, the Court of Appeals for this Circuit assumed that a cause of action based on *Bivens* was available to redress plaintiff's claim that a federal officer had falsely procured his indictment. As the Court stated,

the District Court may eventually have to resolve the question of whether [plaintiff's] complaint states a valid cause of action within the contemplation of *Bivens*. We need not now consider whether *Bivens* authorizes constitutional tort suits against federal officers to the same extent that § 1983 allows similar litigation against state functionaries.

569 F.2d at 18 n.8.

position regarding the availability of tort remedies to redress invasions of constitutional rights. Rather, developments in this area of the law have come from the lower courts, and decisions abound. A review of these cases reveals sharp disagreements among the different circuits. In the First Circuit, *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977) refused to imply a cause of action based on the due process clause of the fourteenth amendment. The Second Circuit took an opposite view on the due process question in *Gentile v. Wilson*, 562 F.2d 193, 196–97 (2nd Cir. 1977), while the Third found jurisdiction but reserved decision on the validity of the substantive claim in *Gagliardi v. Flint*, 564 F.2d 112, 114–16 (3rd Cir. 1977); *see id.* at 117 (concurring opinion) (finding cause of action). The Third Circuit, however, has recognized a first amendment cause of action in the *Paton v. LaPrade*, 554 F.2d 862, 869–70 (3rd Cir. 1975), decision.

In the Fourth Circuit, *States Marine Line, Inc. v. Schultz*, 498 F.2d 1146, 1156–57 (4th Cir. 1974), implied a cause of action based on the fifth amendment, in contrast to the Fifth Circuit's recent en banc decision in *Davis v. Passman*, 571 F.2d 793 (5th Cir. 1978). The Sixth Circuit has yet to decide the fifth amendment question but its favorable decision in the first amendment case of *Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392, 1393 (6th Cir. 1975), drew from the reasoning employed in fifth amendment decisions.

A review of the Seventh Circuit's decisions indicates one case, *Fitzgerald v. Porter Memorial Hospital*, 523 F.2d 716, 718–19 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1518, 47 L.Ed.2d 768 (1976), that suggested the availability of a fourteenth amendment cause of action; another, *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 577 (7th Cir. 1975), *cert. denied*, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), that upheld federal question jurisdiction to entertain a claim

based on the procedural due process element of the fourteenth amendment; and still another decision, *Cannon v. University of Chicago*, 559 F.2d 1063, 1082 (7th Cir. 1977), that contained approving dicta on the general availability of relief for violations of basic constitutional guarantees.

The Eighth Circuit upheld jurisdiction to hear a claim based on the sixth amendment right to effective assistance of counsel in *Wounded Knee Legal Defense/Offense Committee v. F.B.I.*, 507 F.2d 1281, 1284 (8th Cir. 1974), and assumed the availability of *Bivens* remedies but found no violations of fair trial and privacy rights in *McNally v. Pulitzer Pub. Co.*, 532 F.2d 69, 76 (8th Cir.), *cert. denied*, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976). The Ninth Circuit expressed similar views on the jurisdictional question in the fifth, sixth and eighth amendment contexts in *Mark v. Groff*, 521 F.2d 1376, 1378 (9th Cir. 1975), as did the Tenth Circuit with respect to the first, fourth, fifth and ninth amendments in *Kite v. Kelley*, 546 F.2d 334, 337 (10th Cir. 1976), and *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926 (10th Cir. 1975). The Ninth Circuit went beyond the jurisdictional issue in *Jacobson v. Tahoe Regional Planning Agency*, 558 F.2d 928, 936, 941–42 (9th Cir. 1977), to hold that separate damage actions are permissible under the due process and just compensation clauses of the fifth amendment. Beyond that, the Ninth Circuit has suggested in the *Bennett v. Campbell*, 564 F.2d 329, 331–32 (9th Cir. 1977) case that *Bivens* claims may be available to redress any violation "of constitutional rights." *See also Gray v. Union County Intermediate Education District*, 520 F.2d 803, 805 (9th Cir. 1975).[21]

Unlike in the Ninth Circuit, the decisions of the District of Columbia Circuit have intimated no suggestion that *Bivens* extends beyond the fourth amendment to cover the full roster of constitutional protections. While this Circuit has indicated a willingness to *consider* broader applications

---

21. For additional cases, see Lehmann, *Bivens and its Progeny,* 4 Hastings Const.L.Q. 531, 566–68 & nn.226–229 (1977).

of *Bivens, Payne v. District of Columbia,* 182 U.S.App.D.C. 188, 198, 559 F.2d 809, 819 (1977) (fifth amendment); *Lewis v. D. C. Department of Corrections,* 174 U.S.App. D.C. 483, 484, 533 F.2d 710, 711 (1976) (eighth amendment); *Apton v. Wilson,* 165 U.S.App.D.C. 22, 35, 506 F.2d 83, 96 (1974) (fourth and fifth amendments); *Cardinale v. Washington Technical Institute,* 163 U.S. App.D.C. 123, 128, 500 F.2d 791, 796 n.5 (1974) (fifth amendment), few cases indeed have gone so far as actually to *hold* that damage remedies are proper to redress constitutional violations outside the fourth amendment context. This reluctance to reach firm conclusions on the reach of *Bivens* is no doubt traceable to the recognized fact that the implication of damage liability in the absence of legislative direction involves a determination that is based largely on discretionary considerations. As this Circuit noted in *Payne,* the "question is 'whether compensatory relief is "necessary" or "appropriate" to [the] vindication'" of the asserted right. 182 U.S.App.D.C. at 207, 559 F.2d at 818, *quoting Bivens, supra,* 403 U.S. at 407, 91 S.Ct. 1999 (Harlan, J., concurring). *See also id.* at 206, 559 F.2d at 827 (concurring opinion).[22]

These factors were recently applied in *Dellums v. Powell,* 184 U.S.App.D.C. 275, 302–03, 566 F.2d 167, 194–95 (1977), to justify implying a *Bivens* action for first amendment infringements. *Dellums* involved a suit by a congressman and a group of individuals who charged that police officers violated their rights of free expression by breaking up through mass arrests a demonstration in the nation's capital at which the congressman and protest leaders were expected to deliver speeches against the Vietnam War. Recognizing the concerns voiced in Justice Harlan's concurring opinion in *Bivens* that " 'the appropriateness of money damages may well vary with the nature of

the personal interest asserted,' " 184 U.S. App.D.C. at 302, 566 F.2d at 194, *quoting Bivens, supra,* 403 U.S. at 409, 91 S.Ct. 1999 (concurring opinion), the Court of Appeals nevertheless concluded: "it is difficult to identify here the impediments feared by Mr. Justice Harlan." *Id.*

This conclusion regarding the application of *Bivens* to the first amendment area is by no means surprising given the sharp parallels that can be drawn between *Dellums* and *Bivens.* As in *Bivens,* the *Dellums* case presented violations of " 'basic constitutional rights in their most pristine and classic form.' " *Id.* at 302, 566 F.2d at 194–95, *quoting Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). There can be little doubt that the arrest of persons airing their grievances at the seat of government, like the forcible entry and warrantless search of a private residence, qualifies as an assault on core protections afforded by the first and fourth amendments. Similarly, in *Dellums,* as was the case in *Bivens,* the absence of a constitutionally-based damage remedy meant that plaintiffs would have to pursue inadequate state remedies that offered little assurance of protecting constitutional interests. In neither case were there alternative federally-created remedies that plaintiffs could pursue to redress invasions of their constitutionally protected interests. And finally, in *Dellums,* as in *Bivens,* plaintiffs were faced with a situation of recovering "damages or nothing." *Bivens, supra,* 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring). The peculiarly personal nature of plaintiffs' injuries in these cases made injunctive relief in practical effect no remedy at all.

■ This, however, is decidedly not the situation presented in the case at bar. A

---

**22.** *Payne* involved a fifth amendment claim based on an allegation that a police officer maliciously aimed and discharged his service revolver at plaintiffs as they were sitting innocently in their automobile. The only issue was that the lower court erred in dismissing the case for want of federal question jurisdiction. *Payne* did not decide whether *Bivens* remedies

were available to redress plaintiffs' asserted constitutional violations. "The court exhausts its present function when it concludes that the District Court has jurisdiction to make that determination upon reaching the merits." 182 U.S.App.D.C. at 208, 559 F.2d at 819.

close look at the circumstances prevailing here along side the circumstances involved in *Bivens* and *Dellums* reveals that this case is as distant from *Dellums* and *Bivens* as *Dellums* and *Bivens* are close to one another. In the first place, the constitutional violations asserted in the instant case do not involve core constitutional protections of the sort presented in *Bivens* and *Dellums.* Whatever can be said of the first amendment rights afforded public employees in the work place, it is plain that these guarantees do not amount to basic protections " 'in their most pristine and classic form.' " *Dellums, supra,* 184 U.S.App.D.C. at 302, 566 F.2d at 194–95, *quoting, Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963). On the contrary, the first amendment rights of public workers, like plaintiff here, are circumscribed by business necessities and the imperative of maintaining orderly and efficient public administration.

In addition, by contrast to *Bivens* and *Dellums,* the plaintiff in the instant case will not be remitted to pursuing inadequate state law remedies if no damage action is implied in his favor. Title VII fully protects his asserted interest in advocating changes in his agency's employment practices to benefit fellow minority workers. *See, e. g., Stith, supra.* Nor will the plaintiff in the present case be confronted with a damage or nothing situation if his constitutional damage claim is disallowed. Unlike in *Bivens* and *Dellums,* plaintiff's injuries are primarily economic injuries that can be readily remedied through the issuance of back pay and reinstatement orders under Title VII.

 In short, what emerges is that even though *Dellums* implied a damage action for the violation of first amendment rights, there is nothing in the facts or rationale of that decision, or in those of *Bivens* itself for that matter, that justifies taking the same step in the suit at bar. Merely because this case involves claims based on the same amendment that was involved in *Dellums* is no warrant for reaching an identical result. There must be a persuasive reason for a court to imply a remedy not authorized by Congress and in this instance, in light of the availability, *and efficacy,* of Title VII's comprehensive remedies, that reason is lacking. Were this a case where plaintiff's first amendment claims were *unrelated* to his Title VII claims in the sense that different conduct was being challenged and different interests asserted, a different result might well obtain. Such a case might arise if an employee claimed he had been penalized both because of his race, or sex, or national origin and because of his advocacy *on subjects unrelated to minority rights.* Similarly, a different result might obtain were this a case where, because of the predominantly' personal, non-economic nature of plaintiff's injuries, Title VII remedies were likely to be ineffective in redressing plaintiff's protected rights of advocacy. Such, however, is not the case here. Where, as in this case, plaintiff's first amendment claim challenges conduct outlawed by Title VII and attempts to vindicate rights of expression also protected by the statute, and where, as here, Title VII's remedial measures promise to be effective in redressing the asserted wrongs, there is simply no sound reason for treating the claims separately by implying a damage cause of action not authorized by Congress.

### IV. *Conclusion and Disposition.*

For these reasons, the Court is of the opinion that while the Supreme Court's decision in the *Brown* case provides no basis for extinguishing claims brought by federal employees against supervising officers in their individual capacities, neither does the *Bivens* decision afford a warrant for implying damage liability where Title VII applies. An order dismissing plaintiff's first amendment claims will be issued of even date herewith.