**Mary Williams CAZALAS**

v.

**UNITED STATES DEPARTMENT OF JUSTICE.**

Civ. A. No. 80–761.

United States District Court, E.D. Louisiana.

April 15, 1983.

Sylvia Roberts, Baton Rouge, La., Mary Williams Cazalas, New Orleans, La., for plaintiff.

Barbara L. Gordon, Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MENTZ, District Judge.

Plaintiff, Mary Williams Cazalas, served as an Assistant United States Attorney in the Eastern District of Louisiana for eight years. On April 20, 1979, this employment was terminated and Mrs. Cazalas filed the instant lawsuit alleging that she had been unlawfully dismissed from the United States Department of Justice based upon her sex. She also claimed that her free speech and due process rights had been violated and that her termination represented an unlawful retaliation for her action in filing an Equal Employment Opportunity complaint. Plaintiff's causes of action were founded upon the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C., Section 2000e *et seq.* (hereinafter referred to as "Title VII"), and the First and Fifth Amendments to the United States Constitution. Although she originally contended that she was damaged by the "libelous and slanderous allegations of John Volz and others," the plaintiff subsequently moved for voluntary dismissal of these claims. Named defendants in the original complaint included John Volz, United States Attorney for the Eastern District of Louisiana; the United States Department of Justice; and former Attorney General Benjamin Civiletti, the Justice Departmental chief at the time of plaintiff's dismissal.[1]

On September 1, 1981, the Court permitted plaintiff's amendment to the complaint, the matter having been brought before the Court by the defendants' motion for a review of the Magistrate's February 6, 1981, order which granted the motion to amend.

---

**1.** Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Attorney General William French Smith has been substituted for former Attorney General Benjamin Civiletti, insofar as plaintiff's claims against Civiletti in his official capacity are concerned.

The amendments expanded the scope of potential liability by asserting claims based upon Title VII and the First and Fifth Amendments against John Volz and Benjamin Civiletti in their individual capacities. Plaintiff's requested relief included declaratory and injunctive relief, back pay, and compensatory and punitive damages.

Mrs. Cazalas contended that her termination was a result of a conspiracy by Benjamin Civiletti, John Volz, Albert Winters, Robert Boitmann, Michaelle Pitard, and others to discriminate against her because of her sex. The plaintiff alleged that she was treated disparately based upon her sex. She further contended that there existed a pattern and practice of sex discrimination in the United States Attorney's Office at the time of her termination and after her termination. The defendants, however, advanced the following reasons to substantiate the plaintiff's termination: a lack of discretion and good judgment, incompetence, unwillingness to function as an advocate for the government's clients, lack of supervisability, inability to maintain office confidences, inability to get along with clients, and overstepping the boundaries of the position as an Assistant United States Attorney. Thus, the defendants contended that the plaintiff's termination was based upon legitimate, non-discriminatory reasons. The plaintiff, however, asserted that such reasons were a mere pretext for sexual discrimination.

The defendants substantiated their contentions with evidence relative to situations and events of the plaintiff's employment as an Assistant United States Attorney. These incidents, which precipitated a morass of witness testimony and documentary evidence, were initially related through Mr. Volz's December 29, 1978 letter to Mr. Civiletti that requested the plaintiff's termination. In its adjudication, the Court has focused on the seemingly most significant of the situations in which the plaintiff was involved, scrutinizing the underlying facts in light of each party's allegations. While impossible to re-create the totality of circumstances, the Court has considered and has based its conclusions on the detailed descriptions of the controverted incidents that were presented at trial. Thus, the findings below represent the result of the Court's analysis of the totality of events that led to the plaintiff's termination, with particular attention to those presented by Mr. Volz to Mr. Civiletti.

Prior to trial, defendants brought a motion for partial summary judgment seeking dismissal of the plaintiff's constitutional claims relative to employment discrimination brought against Messrs. Volz and Civiletti in their individual capacities. It was also requested that judgment be entered to bar the First and Fifth Amendment damage claims against the individual defendants, to dismiss plaintiff's retaliation claim, and to reject plaintiff's claims for punitive and compensatory damages. The motion was brought for oral argument on October 7, 1981; the Court declined to make the legal determinations presented by the summary judgment motions prior to trial and reserved its ruling. This opinion shall thus incorporate all legal issues pertaining to Mrs. Cazalas' lawsuit as well as the factual findings.

As its adjudicative touchstone, the Court is mindful of the limitations inherent in attempting to recreate professional endeavors, daily incidents, and human relationships within the confines of federal rules and burdens of proof. The Court is equally cognizant that the nature of the instant lawsuit lends itself to the erroneous impression that the Court has assumed the task of judging individual merit.

The matter proceeded to trial before the late Judge Jack M. Gordon on October 19, 1981, and was completed on October 28, 1981. The Court allowed time for the completion of additional deposition testimony and took the matter under advisement on November 11, 1981. The case being under advisement at the time of Judge Gordon's death, the parties entered a stipulation dated July 20, 1982, to allow Judge Henry A. Mentz, Jr., to decide the case based upon the record established during the trial and in pre-trial proceedings. Having reviewed

the evidence, the memoranda of counsel, and the applicable law, the Court now enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

I. Factual Findings Relative to the Reasons for Plaintiff's Termination

1.

█ Plaintiff Mary Williams Cazalas, a white female, assumed duties as an Assistant U.S. Attorney for the Eastern District of Louisiana on February 16, 1971, during the tenure of U.S. Attorney Gerald Gallinghouse. As a member of an executive agency, Mrs. Cazalas was an excepted civil service employee. Her employment with the U.S. Department of Justice was terminated on April 20, 1979 and the plaintiff presently serves as a trial attorney at the Equal Employment Opportunity Commission.

2.

Plaintiff's lawsuit named the following defendants: the U.S. Department of Justice, an agency of the U.S. government; Benjamin R. Civiletti, former U.S. Attorney General, who is sued in his individual capacity; John Volz, U.S. Attorney for the Eastern District of Louisiana, who is sued in his official and individual capacities; and William French Smith, U.S. Attorney General, who is sued in his official capacity only.

3.

The following narrative relates the proceedings relative to the plaintiff's departure from the U.S. Attorney's Office. The cumulative effect of problems relative to Mrs. Cazalas' performance as an Assistant U.S. Attorney led Mr. Volz to the conclusion, after numerous conferences with members of the supervisory staff of the U.S. Attorney's Office, that the plaintiff was not an asset to the office, Mr. Volz preceded his actions with discussions with the appropriate officials of the Justice Department in Washington, D.C., including William Tyson, the then Acting Director of the Executive Office of U.S. Attorneys.

On October 3, 1978, Mr. Volz advised Mrs. Cazalas to locate other employment and allowed her 90 days in which to comply with his request. Mr. Volz thus afforded the plaintiff an opportunity to gracefully leave the office before a formal request would be made seeking her removal; Mrs. Cazalas was asked to provide a letter of resignation effective January 1, 1979. Mr. Volz advised the plaintiff that such action was necessitated by the numerous complaints the office had received with respect to her conduct and her representation of the government, as well as internal problems relating to her supervisability. On October 7, 1978, the plaintiff filed an informal Equal Employment Opportunity (hereinafter "EEO") complaint alleging discrimination based upon her sex. Mr. David Mormon was thereafter sent from the U.S. Department of Justice to conduct an informal investigation of the complaint. While noting that report that was prepared in his function as an EEO counselor represented no determination as to Mrs. Cazalas' competence, Mr. Mormon found no substantive support for her sex discrimination allegations.[2] Mr. Mormon explained to the plaintiff the employment prerogatives of the U.S. Attorney regarding exempt personnel. Prior to the completion of Mr. Mormon's counseling, Mrs. Cazalas, on November 9, 1978, filed a formal EEO complaint. Subsequently, the plaintiff's discrimination claim was investigated thoroughly by Mr. Ray Sapporito, an EEO investigator, who concluded that no discrimination against the plaintiff had occurred and that plaintiff was terminated for legitimate, non-discriminatory reasons.

The background for this lawsuit would not be complete without reviewing defendants' exhibit 137, which is an "Analysis of Investigative File and Recommended Findings in the Discrimination Complaint of Mary W. Cazalas," dated October 20, 1981.

---

**2.** The report is based upon meetings with Mrs. Cazalas and interviews with various individuals who had worked with the plaintiff, including Mr. Volz; Daniel Bent, then First Assistant U.S. Attorney; Al Winters, then Chief of the Criminal Division; and several judges in the Eastern District of the U.S. District Court and the Court of Appeals for the Fifth Circuit.

The report begins with some statistical data on the employment ratio of women and men attorneys in the Eastern District of Louisiana, and the Department of Justice. In the Eastern District of Louisiana, on 4–1–78 there were 25% women attorneys; on 10–1–78 there were 21.1% women attorneys; and on 4–1–79 there were 26.1% women attorneys. By comparison the entire Department of Justice as of 12–31–78 had 18.1% attorneys and the Offices of U.S. Attorney had 17.3% women attorneys. The finding was as follows: "The proportion of women attorneys employed in the Eastern District of Louisiana including each of its two components exceeded those of the Department of Justice in all Offices of U.S. Attorney during the same period."

Next, there was statistical data comparing the salaries of the men and women. The finding here was: "The salaries and equivalent grade levels for women attorneys employed in the Eastern District of Louisiana are consistently higher than those for men. The salaries and equivalent grade levels for women in the Eastern District of Louisiana are also higher than those for Department of Justice attorneys and all of the Offices of U.S. Attorney."

In arriving at the conclusion that there had been no discrimination on each of the twelve allegations made by Mrs. Cazalas, the summary and conclusion was as follows:

Throughout the analysis, much weight was given to the affidavit of Mr. G.J. Gallinghouse because of the position he held as U.S. Attorney and the intimate view it gave him of many of the events and persons involved in Mrs. Cazalas' complaint. Furthermore, Mr. Gallinghouse was not named as an alleged discriminatory official, and his present position outside the U.S. Attorney's Office and the Department of Justice suggests that he has little reason to be other than candid. Mr. Gallinghouse's comments consistently reiterate those of other supervisors and managers that Mrs. Cazalas was a disruptive influence, very difficult to supervise and a liability to the office.

Because Mrs. Cazalas indicated that she did not intend to resign, Mr. Volz felt compelled to terminate the employment, having again discussed the matter with the supervisory staff at the U.S. Attorney's Office. The Court gives great credence to Mr. Volz's testimony that sex was absolutely not a factor in his decision. These series of events precipitated Mr. Volz's December 29, 1978 letter to Mr. Civiletti in which he detailed his reasons for the plaintiff's employment termination. Such communication, which related several of the unpropitious situations in which Mrs. Cazalas had been involved, also stressed their resulting discordant effect among the participants from the U.S. Attorney's Office, members of the judiciary, and those involved clients. On March 22, 1979, William Tyson wrote a memorandum to Benjamin Civiletti recommending that he terminate Mrs. Cazalas. Mr. Civiletti's April 4, 1979 letter notified the plaintiff of her termination effective April 20, 1979; Mr. Volz summoned Mrs. Cazalas to his office on April 9, 1979 to inform her of the letter and its contents. Mr. Civiletti substantiated the plaintiff's removal with the information submitted by Mr. Volz, citing reasons of unsatisfactory performance and judgment, failure to submit to supervision, and breaches of confidentiality. Mrs. Cazalas filed an EEO complaint on April 21, 1979, alleging retaliation. On April 23, 1979, Mrs. Cazalas commenced work at the EEOC office in New Orleans, Louisiana.

The Court cannot find fault with the procedures employed to effect the plaintiff's termination of employment. Mr. Volz conferred on a consistent basis with the U.S. Attorney's Office supervisory staff and attempts were made to communicate to Mrs. Cazalas the problems causing Mr. Volz to take such action. The proper officials at the U.S. Department of Justice were apprised of the situation and responded by acting in a monitoring capacity.

4.

The Court finds an incident that occurred during preparation of an appellate brief to be representative of the problems relating

to Mrs. Cazalas' supervisability. Upon an examination of the facts surrounding this situation, the Court cannot find that the defendants acted in a discriminatory manner.

When Mr. Volz assumed office as U.S. Attorney, he altered the internal appellate procedures. Because of his belief that each staff assistant should bear the responsibility for the preparation of appeals resulting from litigation for which he or she was initially responsible, Mr. Volz implemented such practice and named Mr. Robert Boitmann as supervisor of appeals. Mrs. Cazalas had previously handled all appellate briefs in which the government was a party regardless of the attorney who had handled the case on the trial level. She was thus relieved of this responsibility. Mr. Boitmann circulated a memorandum that reflected the change in the appellate procedure and announced the new policy. That is, he initiated the requirement of submission of all appellate briefs for his review prior to filing them with the Court of Appeals.[3]

Despite the above-described instructions, Mrs. Cazalas filed a brief in which she confessed error on the part of the government without having first submitted the brief to Mr. Boitmann. The case had been decided in the government's favor by the district court. Since the plaintiff had received the memorandum communicating the change in procedure as well as personal instructions from Mr. Boitmann regarding the submission date of the brief in question, the Court can find no basis that would substantiate the plaintiff's perception of her exemption from the appellate practices. The plaintiff's failure to follow office procedure in this instance indicates the resultant problems relating to her supervisability.

The above-described incident was aggravated by an instance which the Court must characterize as improper conduct—a characterization asserted by the defendants with which the Court must agree. After the discussion between Mr. Boitmann and the plaintiff that ensued following this controversy, Mrs. Cazalas asked a third party attorney his opinion on the confession of error tactic.[4] Mr. Boitmann testified that he was startled by the appearance of the request on a passer-by for an advisory opinion on internal office policy, and related his impression of the futility of his prior conversation with the plaintiff.

The subsequent discussion between Mr. Volz and Mrs. Cazalas concerning the incident illustrates the problem that Mr. Volz described as the plaintiff's ineffective advocacy. That is, when Mr. Volz suggested that the government's tenable position obviated any need for a confession of error, Mrs. Cazalas informed him that she would not make an argument when she personally felt that the court should rule otherwise. Mrs. Cazalas viewed proceeding with a position with which she disagreed personally as equivalent with impropriety. The Court notes that misrepresentation was not here in issue. The Court must find that such attitude manifested by Mrs. Cazalas did legitimately cause consternation over her ability to function as an advocate.

5.

The level of competency at which Mrs. Cazalas performed was called into question during her management of a suit against

---

3. The memorandum read as follows:

In order to insure that proper administrative control is maintained, all documents relating to appeals are to be initially referred to myself or Mrs. Durel.

Upon receipt of appellant's brief a due date will be given the AUSA assigned the appeal to submit a draft of the proposed brief to me. There will be no exceptions or extensions of the due date. The draft will then be reviewed by me and returned to the AUSA in sufficient time for final typing and submission to the Fifth Circuit.

I will be available at all times and at any stage during the appeal process to provide whatever assistance is necessary for the preparation of the brief or oral argument. Please do not hesitate to ask me questions however small and insignificant they may seem.

4. Mrs. Cazalas and this third party attorney had participated together in another case wherein error had been conceded.

the Veterans Administration. After reviewing the testimony and documentary evidence surrounding this incident, the Court cannot find that the plaintiff's claims of sexual discrimination can be bolstered by this situation. In this case, a female physician employed at the Veterans Administration Hospital sued the doctor who served as medical director, and others, claiming sexual discrimination. While the defendant doctor was convinced of the strength of the case, Mrs. Cazalas, his assigned attorney, took an alternate position and advised him that the case presented serious weaknesses, being doubtful of success for the government. The Court is thus in accordance with the defendant doctor's displeasure over the attitude displayed by Mrs. Cazalas with regards to her representation, it appearing that she persisted in warnings concerning the gravity of the defendant doctor's position. The situation was perceived sufficiently troublesome by the defendant doctor's wife to warrant consideration of engaging private counsel.

The Court has also considered reports of the medical director and his wife that Mrs. Cazalas spoke to them regarding matters in another case that they considered strictly confidential. The specification of these individuals involved by name substantiates to the Court the defendants' concern over Mrs. Cazalas' discretion and ability to maintain confidentiality.

### 6.

Judge Alvin B. Rubin of the Fifth Circuit Court of Appeals testified that he had been appointed to that position in October of 1977, having previously been a United States District Judge from 1966 until his appointment as Circuit Judge. He recalled, in the case of *United States v. Boulet,* stating to Mrs. Cazalas that he did not think her brief was very helpful, and noted the lack of quality in the brief, and thought "It was the duty of counsel for the government to do a somewhat better job." T–852. Judge Rubin stated that only two or three times in the course of his four years, and 500 oral argument cases, did he have occasion to caution an attorney, as the brief was

"singularly bad." When asked whether the other attorneys criticized were also women, he stated that to the best of his memory, "All the others were male." He later told the U.S. Attorney, Mr. Volz, that he felt the "U.S. Attorney's Office would serve itself better if they had better briefs." T–853. Again, at page 859, Judge Rubin stated that "I do recall feeling that a brief for the Government in the *Schilleci* case was markedly inadequate." In questioning Judge Rubin, Mrs. Cazalas argued that this particular brief had been written, for the most part, by Neil Heusel and John Musser. As to his statements to Mr. Mormon as contained in Exhibit P–17A, he stated "I do not think that these are unrepresentative of my opinion at the time." Commenting on the brief filed in *United States v. Schilleci,* Judge Rubin stated "I thought it was not a good defense of the (jury) charge, or the conduct of the trial." At page 868, Judge Rubin stated that he had on one occasion, commended Mrs. Cazalas. At page 869, Judge Rubin explained that his opinion of Mrs. Cazalas was not based solely on her performance in the *U.S. v. Boulet* case but was based upon "my total observation of your conduct as a lawyer before me as a District Judge and an Appellate Judge." Again, at page 872, he testified that he recalled reading two of Mrs. Cazalas' briefs, and "I thought that they were both bad, yes, 100%." He added "I think that what I said was that you tried hard and you suffered from a lack of judgment. And I think I still have that opinion, based on your total conduct before me."

After reviewing the details of a case in which Mrs. Cazalas represented the Department of Health, Education and Welfare (hereinafter "HEW"), the Court finds that the case was not handled in the most expeditious and professional manner. The situation serves to point out the disturbing aspects of Mrs. Cazalas' performance as an Assistant U.S. Attorney. The plaintiff in the HEW litigation sought to recover for the alleged wrongful death of her husband who had died after participation in a methadone treatment program. The U.S. Attorney who initially was assigned the case

made little progress in the matter; when the case was reassigned to another Assistant U.S. Attorney, Mrs. Cazalas' assistance was requested.

The U.S. Attorneys had been requested repeatedly to file a motion to dismiss based upon a dispositive U.S. Supreme Court case; the Department of Justice had provided all pertinent authority and materials to aid motion preparation. Notwithstanding consideration of the initial inactivity in the matter, which cannot be attributed to the plaintiff, it is clear that Mrs. Cazalas unduly delayed in preparing the suggested motion. Although Mrs. Cazalas assured the supervisory Washington official over a five-month period that preparation of the motion was underway and that discovery would thus be obviated, the Washington office received a frantic phone call from Mrs. Cazalas regarding an impending discovery deadline. The supervisory Washington staff, again advising that the Supreme Court case would dispose of the HEW litigation, concluded that Mrs. Cazalas' nursing background and attendant personal interest in the substantive aspects of the case overrode her resolve to prevail in favor of her client.

The Court places significance on both the defendants' immediate concerns stemming from this incident—the unnecessary expense undertaken and potential damage to the ultimate disposition of the case—and on its reflection on Mrs. Cazalas' performance as an advocate. The situation thus factors into the Court's analysis of substantiation of the plaintiff's termination presented by the defendants.

### 7.

The Court finds Mrs. Cazalas' conduct during an incident involving the Department of Housing and Urban Development (hereinafter "HUD") again representative of problems relating to her discretion, supervisability, and relations with client agencies. A misunderstanding arose concerning the necessity and availability of the proper HUD official for execution of an affidavit. While present at the HUD offices, attempting to execute the affidavit, Mrs. Cazalas made several derogatory remarks about the quality and efficiency of the New Orleans HUD legal staff.

Notwithstanding the friction generated between the individuals and the government agencies involved, the plaintiff's inability to contain her frustration reflects detrimentally on the execution of her work. Moreover, the immediate outburst and the resulting complaint registered by Mrs. Cazalas to the Dallas Office of Regional Counsel represent an overstep of her authority owing to her failure to have previously cleared the complaint with Mr. Volz.

### 8.

In a case involving the Department of Health, Education and Welfare, a supervisory female Assistant U.S. Attorney instructed Mrs. Cazalas to argue a motion to request authorization to certify a controlling legal issue to the Court of Appeals. Mrs. Cazalas disagreed with another female staff attorney over the advisability of lodging an interlocutory appeal and explained her reasons against proceeding in such fashion. Resultant of the discussion, Mrs. Cazalas told others that she had been directed to "lie to the courts" or to "snow the presiding judge." The controversy centered on the meaning of the pertinent statute; Mrs. Cazalas advised that she disagreed with the interpretation of the statute which was in favor of the United States and that she agreed with a contrary interpretation. The female staff attorney informed Mrs. Cazalas that the plaintiff's personal belief was of no consequence.

The Court has reviewed the subsequent proceedings of the matter, the situation being complicated by conflicting instructions and by intervention of Washington officials. The significance of the incident, however, lies in the support it lends to the defendants' contentions regarding the plaintiff's supervisability and her indiscretion in making such slanderous statements. Moreover, the disagreement between the plaintiff and the female staff attorney is again indicative of the complaints relative to the plaintiff's intransigent personal views and their deleterious affect on her advocacy skills.

9.

Problems with Mrs. Cazalas' conduct as an Assistant U.S. Attorney persisted despite her placement in the Criminal Division—a transfer intended to alleviate troublesome situations. The Court finds significance in these continued disruptive incidents and in their bearing upon the defendants' perceived need to terminate the plaintiff's employment. Furthermore, analysis of the defendants' actions when viewed as a response to situations foisted upon them yields the finding that sexual discrimination must be excluded as a dynamic in the employment relationship.

When Mrs. Cazalas tried a case involving an illegal importation charge, the presiding federal judge entered judgment against the government prior to submitting the case to the jury. Thereafter, while speaking to a federal magistrate, Mrs. Cazalas commented disparagingly concerning the judge's actions, stating that the judge was influenced politically. When Mr. Volz subsequently requested of Mrs. Cazalas an explanation for her statement, the plaintiff responded only that the remark reflected her opinion.

Based upon his perception of the seriousness of this incident, Mr. Volz sent a telex to Mr. Tyson requesting the plaintiff's suspension. The U.S. Department of Justice refused, however, to utilize the limited suspension procedures; the department either terminated employment or took no action. The Court is in accordance with the defendants' perception of Mrs. Cazalas' conduct, finding that it did indeed illustrate a lack of good judgment and discretion.

10.

The plaintiff's additional assignments in the Criminal Division encompassed work relative to the copyright docket. Much controversy was created by a letter written by Mrs. Cazalas to copyright violators informing them that their continued violation of the copyright statute would be a criminal offense and thus prosecuted by the U.S. Attorney's Office. The letter was written subsequent to a discussion the plaintiff had had with special agents of the Federal Bureau of Investigation. In that discussion, Mrs. Cazalas had advised that individuals involved in activities violative of the copyright statute should be first placed on notice of their transgression and the resultant threat of federal prosecution. While conflict exists regarding clearance by the appropriate supervisory official of these statements as well as to the plaintiff's intention to issue what was considered a policy statement, the fact that Mrs. Cazalas presented such position, in itself, created internal office conflict and misunderstandings between the U.S. Attorney's Office and the F.B.I. agents.

A review of the facts attendant to this incident has fortified the Court's appreciation of Mr. Volz's difficulties in communicating effectively with the plaintiff. Her insistence upon taking notes of the discussion between Mr. Volz and herself relative to this matter, notwithstanding a secretary's presence to record the proceedings, and her seeming inability to understand or to verbalize the meaning of a statement of policy from the U.S. Attorney's Office illustrate the frustration and problems Mr. Volz experienced in supervising the plaintiff. The adverse effect on the efficiency of office operations caused by situations as that above-described is evident.

II. Facts Relative to the Plaintiff's Disparate Treatment Claim

The Court must find that the plaintiff's complaints regarding the alleged disparate treatment accorded her by the defendants are not representative of sexual discrimination; rather, the defendants' actions have been justified and explained by the reasons advanced in response to the plaintiff's allegations. A review of the plaintiff's claims of disparate treatment has yielded the following representative findings.

1.

Mrs. Cazalas' extra-curricular activities included participation in the Federal Women's Program, the Federal Executive Board, the Federal Business Association, and the Federal Bar Association. Mr. Gallinghouse

testified that he had considered these interests laudable and had encouraged the plaintiff's efforts provided no interference with her official duties resulted. Mrs. Cazalas' involvement required time commitments in excess of those relative to other staff attorneys. Testimony revealed that the plaintiff's activities caused unexplained absences from the office. Any criticism resulting from participation in these activities cannot constitute disparate treatment based upon sex.

### 2.

While Mrs. Cazalas objected to the name of the trial attorney being placed on the appellate brief which she had prepared, Mr. Gallinghouse explained that such practice illustrated the importance of the trial attorney's involvement in the litigation. Mr. Gallinghouse attached significance to appellate court awareness of the identity of the attorney who had tried the case. The plaintiff's superiors at the U.S. Attorney's Office had impressed upon her the necessity of collaborating with the trial attorney in writing the appellate brief, especially in formulation of the facts. Mr. Gallinghouse related that the office had experienced several problems due to the plaintiff's failure, on occasion, to confer with the trial attorney.

The Court finds that the placement of the trial attorney's name on an appellate brief written by the plaintiff was an expression of office policy—an exercise of the prerogative of the U.S. Attorney. The practice represented no attempt to treat the plaintiff in a disparate manner.

### 3.

Neither can the Court find any disparate treatment accorded the plaintiff on the basis of her sex by the nominal reference to her as Chief of the Appellate Section by former U.S. Attorney Gallinghouse without a formal designation as Chief. Regarding internal office structure, Mr. Gallinghouse testified as to the maintenance of three paid supervisory positions, these being determined by the U.S. Department of Justice and including: Chief of the Criminal Division, Chief of the Civil Division, and First Assistant U.S. Attorney. The title of Chief of the Appellate Section was given to Mrs. Cazalas as an internal reference only, there being no such official position.

### 4.

The appointment of Robert Boitmann as Supervisor of Appeals for the U.S. Attorney's Office cannot be equated with disparate treatment toward the plaintiff. Mr. Volz explained the rationale in changing the internal appellate procedure, stating that he transferred responsibilities to Mr. Boitmann based upon Boitmann's skills as a professional and as an advocate. Rather than entailing appellate brief writing, Boitmann's duties involved monitoring brief preparation to insure timely filing and a quality work product. Mr. Boitmann testified that the appellate job carried no salary increase, no change in administrative grade, nor parking privileges.

### 5.

Mrs. Cazalas contended that Mr. Volz summoned her to his office on several occasions and conducted "harassment sessions" in the presence of her superiors. Mr. Volz testified, however, that he approached these meetings with mediating intentions. That is, with no purpose to harass, Mr. Volz attempted to counsel the plaintiff with regard to several troublesome situations.

The Court is unable to view the controversial incidents in a vacuum, the equitable outlook demanding, in hindsight, cognizance of the immediacy of a matter and the human reaction provoked thereby. It must also be noted that it is without the province of the Court to pass judgment on the rectitude of disciplinary or administrative procedures utilized in the internal operation of the U.S. Attorney's Office, to the extent that they do not encompass unlawful discriminatory action.

III. Findings Relative to the Existence of a Pattern or Practice of Sexual Discrimination

Mrs. Cazalas claimed that there existed a pattern or practice of sexual discrimination in the U.S. Attorney's Office at

the time of her termination and after her termination, such contention allegedly constituting circumstantial evidence that the plaintiff had been the victim of disparate treatment. The evidence fails to demonstrate, however, any pattern or practice of discrimination based upon sex effectuated during the tenure of either Mr. Gallinghouse or Mr. Volz.

Mr. Gallinghouse related that during his tenure no policy existed that would have prevented women from being hired in the criminal division. Indeed, Mr. Gallinghouse stated that he would have liked to have had a female in the criminal division, and had attempted to persuade Michaelle Pitard to join the criminal section. Mr. Gallinghouse had recommended the hiring of Kathleen Walsh Carland as a trial attorney in the criminal division; she was employed in this capacity for approximately two years. The Court accords weight to Mr. Gallinghouse's testimony that no sexual discrimination was visited upon Assistant U.S. Attorney Elaine Chauvin. Having considered Mrs. Chauvin for Chief of the Civil Division, Mr. Gallinghouse instead named Ms. Pitard.

When Mr. Volz assumed the position of U.S. Attorney on March 1, 1978, he named Richard T. Simmons, Jr. as Chief of the Civil Division to replace Ms. Pitard. Mr. Volz had supervised Mr. Simmons for four previous years at the Federal Public Defender's Office and was thoroughly aware of Mr. Simmons' qualifications and expertise as a trial advocate, which prompted him to make this change. Subsequently, Richard Simmons was appointed Chief of the Criminal Division and Ms. Pitard was renamed Chief of the Civil Division.

The above-described actions cannot be found to be tainted with sexual discrimination. Women did indeed serve in supervisory capacities in the U.S. Attorney's Office. In negating sexual discrimination as an operative force in the U.S. Attorney's Office, the Court is cognizant of the many considerations involved in personnel appointments and of the discretion vested with the U.S. Attorney.

## IV. Factual Findings Relative to the Plaintiff's Retaliation Claim

The Court cannot find any factual support for Mrs. Cazalas' claim of retaliation. The alleged retaliatory action occurred on October 3, 1978, which is the date Mr. Volz informed the plaintiff that she would be terminated unless she voluntarily resigned. Mrs. Cazalas, however, did not file her administrative complaint until October 7, 1978. Thus, Mr. Volz could not have acted out of retaliation for the filing of the complaint.

## CONCLUSIONS OF LAW

### I.

*Jurisdiction*

The Court must initially consider the jurisdictional issues and their relation to the avenues on which the plaintiff is entitled to proceed for relief. Mrs. Cazalas seeks damages from Civiletti and Volz in their individual capacities in compensation for an alleged conspiracy that resulted in violation of her rights. The plaintiff contended that these gentlemen's role in her termination forms the basis for her claims of sexual discrimination and violations of both her First Amendment rights and the procedural protections guaranteed by the due process clause of the Fifth Amendment. Thus, the alleged constitutional violations are grounded upon employment discrimination claims and non-employment discrimination claims.

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court permitted a damage remedy to be implied directly from the Fourth Amendment. The victim of an unlawful search and seizure by federal agents was accorded the right to recover damages against the agent in federal court, despite the absence of any statute conferring such a right. The Supreme Court extended its theory to allow a damage remedy under the equal protection component of the Fifth Amendment in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). Subsequently, the Supreme Court implied a

damage remedy under the prohibition on cruel and unusual punishment of the Eighth Amendment. *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Restrictions, however, have been placed upon the *Bivens* cause of action; such limitations comprise the subject of the legal determination below.

### A. Redress for Claims of Sexual Discrimination in Federal Employment.

■ Section 717 of the Civil Rights Act of 1964, as added by § 11 of the Equal Employment Act of 1972, 42 U.S.C. § 2000e–16, proscribes federal employment discrimination and establishes an administrative and judicial enforcement system. Section 717(a) provides that personnel actions affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–16(a). Under section 717(b) and a subsequent reorganization plan, the Equal Employment Opportunity Commission has been delegated enforcement authority of the anti-discrimination provisions of the Act, empowered to utilize "appropriate remedies, including reinstatement with or without back pay." *Id.,* § 2000e–16(b).[5] Section 717(c) establishes the mechanisms for administrative relief, requiring their exhaustion prior to permitting an aggrieved employee to seek *de novo* review in district court. *Id.,* § 2000e–16(c).

In *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Supreme Court examined the legislative history and the structure of the 1972 amendment to Title VII that extended its protections to federal employees. In consideration of a racial discrimination claim raised by a General Services Administration employee, the *Brown* court held that Title VII "provides the exclusive judicial remedy for claims of discrimination in federal employment." The Court found that the "balance, completeness, and structural integrity of § 717" were inconsistent with the contention that the Title VII remedy was intended to supplement other putative judicial relief. 425 U.S. at 832, 96 S.Ct. at 1968.

The Fifth Circuit in *Newbold v. United States Postal Service,* 614 F.2d 46 (5th Cir. 1980) (per curiam), *cert. denied,* 449 U.S. 878, 101 S.Ct. 225, 66 L.Ed.2d 101 (1980) refused to allow a suit for employment discrimination to proceed under 42 U.S.C. § 1981, and followed the *Brown* pronunciation regarding the exclusivity of Title VII relief. The plaintiff had filed suit against the Postal Service, the American Postal Workers Union, the Equal Employment Opportunity Officer, and the attorneys with whom the plaintiff had consulted in pursuing his claim. Noting that *Brown* did not involve a union or individual defendant, the Fifth Circuit stated, "the *Brown* court's broad language on preemption and exclusivity suggests that there is no cause of action against individuals under § 1981 *et seq.*" (citation omitted) 614 F.2d at 47. The *Brown* holding has thus established a progeny in adjudications of damage actions by federal employees against alleged discriminating officials in their personal capacities based on discrimination claims covered by Title VII. *See e.g., White v. General Services Administration,* 652 F.2d 913 (9th Cir. 1981), *Gissen v. Tackman,* 537 F.2d 784 (3d Cir.1976) (per curiam) (en banc); *Neely v. Blumenthal,* 458 F.Supp. 945 (D.D.C.1978).[6]

---

**5.** The 1972 amendments to Title VII extended the coverage of the statute to federal employees, the Civil Service Commission being charged with overseeing the administrative enforcement scheme. Pursuant to President Carter's Reorganization Plan No. 1 of 1978, 43 Fed.Reg. 19807 (May 9, 1978), all of the Civil Service Commission's Title VII administrative functions were transferred to the Equal Employment Opportunity Commission effective May 5, 1978.

**6.** The court in *Neely v. Blumenthal* embarked upon a comprehensive analysis of pertinent judicial authority, centering on the fact that in *Brown v. General Services Administration, supra,* the question of Title VII's preemptive effect on discrimination suits brought against individual officers for damages was not addressed. While offering emphatic assurances of maintaining avenues of relief against officials in their personal capacities, the *Neely* court did not, however, effectuate *Bivens* redress, concluding, "while the Supreme Court's

*See also Purtill v. Harris,* 658 F.2d 134 (3d Cir.1981).

In *Carlson v. Green, supra,* the Supreme Court permitted an administratrix to maintain a constitutionally-based tort action against federal officials based on violations of her decedent's due process, equal protection, and Eighth Amendment rights. Despite the availability of a statutory remedy under the Federal Tort Claims Act (hereinafter "FTCA") the Supreme Court accorded a *Bivens* remedy to the respondent. Integral to the decision was the premise that nothing in the FTCA indicated a Congressional intention to preempt a *Bivens* remedy or to negate an equally effective remedy for constitutional violations. The court footnoted this observation with the following explanation:

> [O]ur inquiry at this step in the analysis is whether Congress has indicated that it intends the statutory remedy to replace, rather than to complement, the *Bivens* remedy. Where Congress decides to enact a statutory remedy which it views as fully adequate only in combination with the *Bivens* remedy, . . . that congressional decision should be given effect by the courts." 446 U.S. at 19, 100 S.Ct. at 1472, n. 5.

The Court attached significance to instances where Congress had explicitly designated FTCA as an exclusive remedy and cited the pertinent statutory authority. Four additional factors indicative of the superior efficacy of the *Bivens* remedy when compared to the FTCA remedy supported the Court's conclusion that Congress did not intend to limit the *Carlson* respondent to FTCA redress. The Court could definitively proclaim that FTCA was an insufficient protector of the citizens' constitutional rights.

In *Brown v. General Services Administration, supra,* the Supreme Court extolled the comprehensive nature of the Title VII remedy, finding no congressional intention to utilize such statutory enforcement mecha-

nisms in tandem with auxiliary relief. This Court accordingly follows the rationale intrinsic in the *Brown* decision and its progeny in the disallowance of Mrs. Cazalas' employment discrimination claims asserted under the constitutional umbrella of protections and brought against Mr. Volz and Mr. Civiletti in their individual capacities. Mr. Justice Rehnquist poignantly expressed the philosophical underpinnings of these constructions in his dissent in *Carlson v. Green, supra,* a view shared by this Court.

> [T]he authority of federal courts to fashion remedies based on the "common law" of damages for constitutional violations likewise falls within the legislative domain, and does not exist where not conferred by Congress. 446 U.S. at 38, 100 S.Ct. at 1482.

Of pivotal importance to the *Davis v. Passman* allowance of a damage remedy based on the Fifth Amendment was the alternate plight of the petitioner had she not been accorded constitutional redress. With no effective means other than the judiciary to vindicate her rights, the *Davis* court found that a claim for relief was stated directly under the Constitution because "[f]or Davis, as for Bivens, 'it is damages or nothing.' " 442 U.S. at 245, 99 S.Ct. at 2277, citing *Bivens, supra,* 403 U.S. at 410, 91 S.Ct. at 2011 (Harlan, J., concurring in judgment).

The *Davis* court proceeded to note the absence of any explicit congressional declaration that would prohibit recovery of money damages and simultaneously recognized that as the plaintiff was not in the competitive service she could not avail herself of the remedial provisions of Title VII, § 717. Of substantial precedential import is the *Davis* court's reliance on *Brown v. General Services Administration.* That is, following its observation relative to the plaintiff's status and the attendant limitations placed upon her avenues for redress, the Supreme Court in *Davis* endorsed the *Brown* authori-

---

decision in the *Brown* case provides no basis for extinguishing claims brought by federal employees against supervising officers in their individual capacities, neither does the *Bivens* de-

cision afford a warrant for implying damage liability where Title VII applies." 458 F.Supp. at 960.

ty in its restatement of the *Brown* holding "that the remedies provided by § 717 are exclusive when those federal employees covered by the statute seek to redress the violation of rights guaranteed by the statute." 442 U.S. at 247, 99 S.Ct. at 2278, n. 26.

Mrs. Cazalas utilized the Title VII mechanisms in seeking redress for her claims of sexual discrimination allegedly occurring during her employment with the U.S. Attorney's Office. With no basis on which to proceed against defendants Volz and Civiletti in their individual capacities seeking damages for such claims—and indeed with the controlling authority militating against such redress—the Court must dismiss the elements of the plaintiff's amended complaint demanding the aforesaid relief.

B. *Non-Discrimination Constitutional Claims.*

 Mrs. Cazalas contended that she was terminated because of her engagement in activities protected by the First Amendment and that she was not afforded the hearing rights required by the due process guarantee of the Fifth Amendment. In redress for such violations, the plaintiff seeks to proceed on a *Bivens* cause of action in requesting damages from Mr. Volz and Mr. Civiletti.

The plaintiff's right to maintain a constitutional tort action against the individual defendants must be examined in light of the Fifth Circuit's controlling decision in *Bush v. Lucas,* 647 F.2d 573 (5th Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 3481, 73 L.Ed.2d 1365 (1982). In *Bush,* the plaintiff brought an action alleging defamation and retaliatory demotion against the director of the Marshall Space Flight Center. The district court rendered summary judgment in favor of the defendant. The Fifth Circuit held that official immunity protected the director from liability for defamation and that the plaintiff had no cause of action for damages under the First Amendment for retaliatory demotion in view of remedies available under the Civil Service Commission. *Bush v. Lucas,* 598

F.2d 958 (5th Cir.1979), *vacated and remanded,* 446 U.S. 914, 100 S.Ct. 1846, 64 L.Ed.2d 268 (1980). The case was remanded for further consideration in light of *Carlson v. Green, supra.*

The Supreme Court in *Carlson* enunciated the two situations wherein an individual's right to recover damages against a federal official for constitutional violations can be defeated. With the absence of a statute conferring such right, courts must heed the following exceptions:

> The first is when the defendants demonstrate 'special factors counselling hesitation in the absence of affirmative action by Congress.' [*Bivens,*] 403 U.S., at 396, 91 S.Ct., at 2004; *Davis v. Passman,* 442 U.S. 228, 245, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective. *Bivens,* 403 U.S., at 397, 91 S.Ct., at 2005; *Davis v. Passman,* 442 U.S., at 245–247, 99 S.Ct., at 2277–2278.
>
> *Carlson v. Green,* 446 U.S. at 18, 100 S.Ct. at 1472.

The *Carlson* decision bore on the *Bush* court's earlier holding that the plaintiff could not seek damages for retaliatory damages. When reexamined under the *Carlson* directives, the Fifth Circuit affirmed its earlier decision and held that special factors counseled hesitation precluding inference of a *Bivens* remedy. Central to the determination was the element of the "unique relationship between the Federal Government and its civil service employees." The court observed, "[t]he role of the government as an employer toward its employees is fundamentally different from its role as sovereign over private citizens generally." 647 F.2d at 576. The distinction between the private and public employment contexts had been accorded significant import in earlier Supreme Court decisions. The Court in *Sampson v. Murray,* 415 U.S. 61, 83, 94 S.Ct. 937, 949, 39 L.Ed.2d 166 (1974) gave recognition to "the well-established rule that the

Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" quoting *Cafeteria Workers v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). *See also, Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).[7]

Of particular relevance to the instant case was the *Bush* court's recognition of the bearing the special government employment relationship has on the procedures through which aggrieved public employees can assert and redress their rights in the employment context—in addition to its effect on employees' substantive rights. "Consistent with the notion that the Government should have wide latitude and control over its employees, Congress, rather than the courts, has traditionally carried the burden of regulating the Government employer-employee relationship." 647 F.2d at 576. The Civil Service Reform Act of 1978 was enacted in execution of this Congressional action. The comprehensive scheme provided by the Civil Service Act thus reflects the congressional awareness of the responsibilities imposed by the government employment relationship.

In *Bivens* and *Carlson,* plaintiffs as private citizens sought damages from agents of the government acting in its sovereign capacity. It is that factor that served to distinguish the situation presented by the *Bush* plaintiff. The Fifth Circuit in *Bush* explained the underpinnings of its holding:

> The employer-employee context of this case serves to distinguish it from suits such as Bivens and Carlson which involved plaintiffs as private citizens seeking damages against agents of the Government acting in its sovereign capacity. Inferring a Bivens remedy in this case would tend to interfere with and undermine the traditional control of the Government over its internal and personnel affairs. It might encourage aggriev-

ed employees to bypass the statutory and administrative remedies in order to seek direct judicial relief and thereby deprive the Government of the opportunity to work out its personnel problems within the framework it has so painstakingly established. Ultimately, it would provide a disincentive for Congress to continue improving the mechanisms by which an aggrieved employee can protect his rights. 647 F.2d at 577.

Thus, the *Bush* court declined to infer a *Bivens* remedy, basing its rationale on the government employer-employee relationship which served as a special factor counseling hesitation in recognition of a constitutional cause of action in absence of congressional affirmative action.

Failure to infer a *Bivens* remedy did not leave the *Bush* plaintiff without redress. Neither will Mrs. Cazalas be situated without avenues for redress. While the specific procedures in *Bush* and the instant case differ by virtue of Mrs. Cazalas' status as an excepted service employee, the *Bush* court's holding stands paramount in the instant determination.

As a member of an executive agency, Mrs. Cazalas is subject to the Merit System Principles of the Civil Service Reform Act of 1978. The plaintiff, desiring to raise her constitutional claims against Mr. Civiletti and Mr. Volz, is thus entitled to avail herself of the procedures established by the statutory scheme. 5 U.S.C. § 2301 *et seq.* As termination of any federal employee violative of constitutional rights constitutes a prohibited personnel practice under § 2302(b)(11), an aggrieved employee may file claims with the Special Counsel of the Merit System Protection Board (hereinafter "MSPB"). The Special Counsel is thus empowered to conduct investigations of these claims and to recommend corrective action to the proper agency. *Id.* § 1206(c)(1)(A). Upon the agency's failure to comply with

---

**7.** Justice Powell's concurrence in *Arnett v. Kennedy* illustrates this precept of government employment. The court had held that a civil service employee had no due process right to a pretermination evidentiary hearing. Justice Powell, emphasizing the government's and the

public's interest in employee efficiency and discipline, stated that "[t]o this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs." 416 U.S. at 168, 94 S.Ct. at 1651.

the submitted recommendations, the Special Counsel may request the MSPB to consider the matter. The Board may order appropriate corrective action. *Id.* § 1206(c)(1)(B).

The existence of the aforesaid statutory scheme and its relation to the considerations surrounding the availability of the plaintiff's right to assert constitutional claims seeking money damages must be evaluated in light of the *Bush* pronouncement. The above-quoted language of the *Bush* court, indicative of its attitude within the confines of the *Bush* case *and* representative of the direction to be assumed in such future determinations, is thus equally applicable in the context of Mrs. Cazalas' claims. This Court being bound to follow and effectuate the theoretical basis it discerns operative in the *Bush* case, the plaintiff's constitutional non-discrimination claims against Mr. Volz and Mr. Civiletti must be dismissed. When confronted with statutory remedies, the very passage of which manifests a congressional intention to provide its own remedial scheme, the Court cannot maintain an alternate cause of action. Furthermore, with no compelling reason to justify a transgression of the prevailing Supreme Court and Fifth Circuit directives nor of the established administrative relief, the Court finds that Mrs. Cazalas' status as a government employee serves as a special factor which counsels hesitation in recognizing a constitutional cause of action in the absence of affirmative action by Congress.

## II.

*Title VII Adjudication*

■ A. Allocation of the burden of proof utilized in a Title VII case was delineated in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The order of proof dictates that the plaintiff bear the burden of proving a prima facie case of discrimination by a preponderance of evidence. Upon the plaintiff's

establishment of the prima facie case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason" for the alleged discriminatory action. 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant articulates such reason, the plaintiff must be afforded the opportunity to prove by a preponderance of the evidence that the reasons advanced by the defendant were in fact a pretext for discrimination.

■ The prima facie case entails a showing by the plaintiff that (i) [s]he belongs to a group protected by the statute; (ii) [s]he was qualified for the job from which [s]he was discharged; (iii) [s]he was terminated; and (iv) after the termination, the employer hired a person not in the plaintiff's protected class, or retained those having comparable or lesser qualifications, not in plaintiff's protected class. *Whiting v. Jackson State University*, 616 F.2d 116 (5th Cir.1980). The prima facie showing under *McDonnell Douglas* is not equated with a factual finding of discrimination. It is, rather, proof of an employer's actions from which an inference of discriminatory animus is drawn. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

■ Since the Supreme Court's decision in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the extent of the defendant employer's burden has been clarified.[8] In responding to the plaintiff's prima facie showing of employment discrimination, the defendant "need only produce admissible evidence that would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine v. Texas Department of Community Affairs*, 647 F.2d 513 (5th Cir.1981) (on remand). The defendant's burden, then, is framed as one of production rather than persuasion.

**8.** The Fifth Circuit in *Burdine v. Texas Department of Community Affairs*, 608 F.2d 563 (5th Cir.1979) had concluded that a rebuttal of the plaintiff's prima facie case required the em-

ployer to establish non-discriminatory reasons for the alleged discriminatory employment action by a preponderance of the evidence.

■ If the employer successfully bears his burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. In proceeding with the factual inquiry, the plaintiff is given the opportunity to demonstrate that the proffered reasons for the employment decision were not the true reasons. At this stage, the plaintiff's burden merges with her ultimate burden of persuading the Court that she has been victimized by intentional discrimination. "She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In order to establish a Title VII violation, the plaintiff must demonstrate that sex discrimination served as a significant motivating factor in the employment decision; a violation cannot be based upon an impermissible factor having played some part in the employer's action. *Whiting v. Jackson State University,* 616 F.2d at 121.

Since the advent of Title VII, a myriad of factual situations have been foisted upon the courts in efforts to seek judicial determinations of the parameters of legal employment practices. In the transformation of courtrooms into arenas for employer-employee confrontations, the judiciary has attempted to mediate conflicts and complaints, establishing a plethora of legal precedent awesome in quantity and in subject matter. While utilizing such guidelines and heeding the established standard of proof, the Court must note that its determination is premised upon an individual consideration of the facts, equities and intangibles peculiar to the instant case.

Representative of the judiciary's work in the Title VII area is the Fifth Circuit's decision in *Burdine v. Texas Department of Community Affairs,* 647 F.2d 513 (5th Cir. 1981). On remand, the court affirmed the district court's finding that no discrimination was operative when the plaintiff had been terminated for the good of the agency. Similarly, the basis for termination in *Cole-*

*man v. Missouri Pacific Railroad Co.,* 622 F.2d 408 (8th Cir.1980) could not be found to have been motivated by sexual bias. No Title VII violation could thus be established when the evidence substantiated the plaintiff's poor job performance and inability to handle assigned tasks. In *Cedeck v. Hamiltonian Federal Savings and Loan Association,* 551 F.2d 1136 (8th Cir.1977), evidence portrayed the plaintiff's difficulties with the bank's computer system and in relations with fellow employees, in addition to a fair number of questionable absences. The court could not find that the defendant's failure to promote the plaintiff resulted from sexual discrimination.

■ The Court herein pretermits the question of whether the plaintiff has established a prima facie case of sexual discrimination. The defendants have successfully carried their burden by the production of evidence which has negated any discriminatory animus as a motivating force in their employment decisions. The proof advanced by the defendants explanative of the plaintiff's termination, of the alterations and policies relative to the operation of the U.S. Attorney's Office, the structure and assignments of the work force, and of the unpleasant encounters among staff members, have demonstrated to the Court that the behavior and the interaction attendant to all such actions stemmed from legitimate, nondiscriminatory reasons. The defendants presented such reasons through the enlightening trial testimony of those involved individuals and through supportive documentary evidence; indeed, both sides submitted thorough and well-documented cases. The Court thus opines that the substantiation of the defendants' employment decisions related in the above findings of fact represents an articulation of lawful reasons for the conduct challenged by the plaintiff. The Court deems unnecessary a particularization of the defendants' reasons and actions behind each described incident. Unable to demonstrate that the defendants' reasons were pretextual, the plaintiff cannot prevail in her Title VII claim.

While exhibiting no lack of sympathy for the course of events resulting in the plaintiff's termination from the U.S. Attorney's Office, the Court cannot accord legal redress in every unfortunate situation. Employment discord cannot be equated with intentional sexual discrimination. The Court must thus give credence to the employer, who, in the exercise of his discretion, terminates an employee who has been considered a hindrance to productivity.

B. The Court cannot find that the failure to appoint Mrs. Cazalas to a supervisory position in the U.S. Attorney's Office constituted sexual discrimination. Neither can it be found that Mr. Boitmann's placement as Supervisor of Appeals manifested disparate treatment. Mr. Volz explained his rationale for charging Mr. Boitmann with the appellate supervision. This positioning not discrediting Mrs. Cazalas' objective qualifications, the Court understands that subjective considerations attached to Mr. Volz's actions. Defendants have thus articulated reasons for various appointments; these explanations negate any utilization of a pattern or practice of sexual discrimination. Ms. Pitard, while replaced as Chief of the Civil Section upon Mr. Volz's assumption of office, later resumed this position. The testimony revealed that after due consideration, it was deemed inappropriate to appoint Ms. Chauvin as Chief of the Civil Division.

> ... Title VII does not obligate an employer to accord this preference. [to hire the minority or female applicant who has equal qualifications to the white male applicant] [T]he employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria. The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be

probative of whether the employer's reasons are pretexts for discrimination. (citations omitted). *Texas Department of Community Affairs v. Burdine,* 450 U.S. at 259, 101 S.Ct. at 1097.

The defendants' reasons for various appointments cannot be characterized as pretextual, in light of their overriding interest in the efficiency and harmonious functioning of the U.S. Attorney's Office. The Court cannot find any basis on which to impose liability on the U.S. Attorney's Office or on the Department of Justice for the failure to hire more females or to appoint more females to supervisory positions. *See, Bauer v. Bailar,* 647 F.2d 1037 (10th Cir. 1981) (wherein the court, in considering an affirmative action program, found no legal requirement that an employer give preferential treatment to qualified minorities or women).

C. *Retaliation*

The plaintiff's additional claim is based upon the Title VII prohibition against any action an employer may take towards an employee in retaliation for his participation in an investigation, proceeding, or hearing relating to employment discrimination. 42 U.S.C. 2000e–3(a). In order to prevail upon a claim of unlawful retaliation under § 704(a), it is incumbent upon the plaintiff to initially establish a prima facie case. *McDonnell Douglas Corp. v. Green, supra.*[9] In presenting the prima facie case, the plaintiff must prove (1) that she participated in a Title VII proceeding and that her participation was known to the retaliator; (2) that she suffered adverse employment treatment during or after the participation; and (3) a causal connection between the adverse employment treatment and the participation. *Crawford v. Roadway Express, Inc.,* 485 F.Supp. 914 (W.D.La. 1980); *Grant v. Bethlehem Steel Corporation,* 622 F.2d 43 (2d Cir.1980).

---

**9.** The order of proof in a retaliation case follows the *McDonnell Douglas* rule. That is, after the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the alleged acts of reprisal. The burden then returns to the plaintiff for a chance to demonstrate that the employer's reasons are a mere pretext for discrimination taken in retaliation for participation in protected activities. *Grant v. Bethlehem Steel Corporation,* 622 F.2d 43, 46 (2d Cir.1980).

**232**

Mrs. Cazalas contended that she was terminated for filing an administrative complaint of employment discrimination, which contention constituted her retaliation claim. The plaintiff thus premised this claim upon the existence of a causal link between the filing of her administrative complaint and the decision to terminate her employment with the United States Attorney's Office.

Evidence presented during trial produced no alternate bases on which Mrs. Cazalas could or did charge unlawful retaliation. The Court must find, then, that the allegations of the plaintiff's complaint contradict the substance of her retaliation claim. That is, the plaintiff alleged that she filed her administrative complaint on October 7, 1978. Complaint IV, ¶ 1. She also alleged, however, that Mr. Volz informed her on October 3, 1978, that she would be terminated unless she voluntarily resigned. Hence, the notification by Mr. Volz four days *prior* to the filing of the EEO complaint presented a sequence of events that do not comport with the plaintiff's allegations. The absence of any evidentiary support for this contention demands that the Court dismiss Mrs. Cazalas' retaliation claim.

### CONCLUSION

In accordance with the foregoing analysis, the Court concludes that the plaintiff failed to establish any violations of the provisions of Title VII. The Court further finds that the plaintiff is unable to maintain the claims brought under the First and Fifth Amendments to the U.S. Constitution; Mrs. Cazalas is precluded from asserting damage claims against Mr. Volz and Mr. Civiletti in their individual capacities.

IT IS THEREFORE ORDERED that JUDGMENT be entered in favor of the defendants, the U.S. Department of Justice, Benjamin R. Civiletti, John Volz, and William French Smith, and against the plaintiff, Mary Williams Cazalas, DISMISSING the plaintiff's suit with prejudice.